The argument of this cause has been conducted in a manner which reflects much honor upon the candor and liberality of the counsel concerned, while it attests in an equal degree their learning and diligent research. The general principles involved in (448) this case are unquestionably of the first importance, derived not merely from the value of the subject in dispute, which, however, is very considerable, but principally from the influence a decision of them must necessarily have, in ascertaining the law of the State, upon points hitherto undecided. It is on this account that my opinion, on some of *Page 370 
the questions, will be given with diffidence; but whatever misapprehensions I may entertain, consolation is derived from the hope that my errors will, at least, be rendered harmless by the judgment of my brethren.
Two questions arise out of the demurrer; one as to the complainant's right, the other as to the sufficiency of the mode in which he has thought proper to prosecute it. For the sake of perspicuity, therefore, it will be proper to state distinctly the charges in the bill under these respective heads:
1st. In relation to the plaintiff's right. On the 12th of November, 1754, Henry Cossart, as trustee for the U. F., obtained from the late Earl Granville two grants for tracts of land in Wilkes County, upon a representation being made to him that a considerable portion of the Wachovia District, a former purchase on the same account, was barren and unproductive, although it had been paid for as arable land. Before the Declaration of Independence, Henry Cossart died, leaving Christian Frederick Cossart, of Antrim, in Ireland, his heir-at-law, who became seized, as the law requires.
Christian F. Cossart, being a subject of the King of Great Britain, and resident in his dominions when the independence of the United States was declared, is supposed to have become an alien to this State, whereby the lands are vested in the State, or by virtue of the confiscation laws subsequently passed.
On the 3d of November, 1772, Christian F. Cossart, in order that the said lands might be sold for the benefit of the U. F., constituted F. W. Marshall, the complainant, his attorney for that purpose, giving him authority to appoint one or more attorneys under him with like (449) powers. On the 4th of October, 1774, Marshall appointed John Michael Graff attorney for the same object, and with the same power.
On the 23d of July, 1778, Graff, in pursuance of his authority, sold the lands to Hugh Montgomery, who paid part of the purchase money and received a conveyance duly executed; and in order to secure the residue, mortgaged the land to Graff, in trust for the U. F. Graff soon after died, and Traugott Bagge, his administrator, on the 30th December, 1784, assigned the term to F. W. Marshall, then and now the agent of the Unitas Fratrum.
In July, 1778, Montgomery took possession of the land, and continued during his lifetime, as his trustees have done since his death, in possession of part of the same.
In December, 1779, Montgomery conveyed the lands to trustees, of whom John Brown is the survivor, in trust for two infant children, and *Page 371 
until their arrival at full age. At the same time Montgomery also made his last will, whereby he charged the rest of his real and personal estate with the payment of his just debts, and particularly the debt due to the Moravians.
The bill then charges a number of persons by name with having taken possession of the lands, pretending to derive a title under William Lenoir, who has obtained grants for the same, under the pretended authority of the land law passed in 1777, claiming the land discharged from the trust.
By an Act of Assembly, passed in 1782, it is enacted that the power of attorney of Christian F. Cossart, dated the 3d April, 1772, empowering the said Marshall to sell his land, be admitted to probate and registry in the county of Wilkes and be as good and valid in law as it could or might have been had the act of confiscation never passed.
2d. In relation to the remedy. That the U. F. has been acknowledged as an ancient Episcopal Protestant Church by the Parliament of G. B. and the Bishops of the Church of England, by a public act of Parliament of the year 1749. As such it hath subsisted in this State about forty years, and the title and style of the said act of Parliament has been acknowledged and ratified by acts of the (450) General Assembly of this State, as well as in various legal proceedings since.
The church has neither joint stock, funds, nor revenue, yet at sundry times the active members among them, such as the lord advocate, the chancellor and agent, have caused loans for general concerns to be made among their friends and able members, particularly for new settlements, as was done in the purchase of the Wachovia district. For these objects great capitals have been raised, upon condition that the creditors should receive land in payment if they came to this State, or out of the sale thereof by him who has the fee.
F. W. Marshall, the complainant, is at present seized in fee of the lands which he is authorized to sell, and in general to conduct and manage their concerns. He is likewise authorized to institute suits in law or equity concerning the matters complained of in the bill; and the U. F. are bound and concluded by all such judgments and decrees as may be rendered in any court of this State in which suits may be brought.
Besides the general prayer, the bill seeks a disclosure of the defendant's title, a conveyance of the legal estate, if they have any, to Montgomery's trustees, or a surrender of the possession for the benefit of the heirs.
If the title which Christian F. Cossart had in these lands was divested out of him, and vested in the State, it must have been either by *Page 372 
confiscation, forfeiture by reason of alienage, or escheat for want of a legal proprietor.
If by either of these means it shall appear that the legal title has devolved upon the State, it will then be necessary to inquire whether it is subject to the trust or equitable claim which accompanied it in the hands of Cossart.
1st. The act passed in 1782 appears to me to have precluded the necessity of investigating the question, whether the confiscation laws attached upon the lands as the property of Cossart; for, on the supposition that they did so attach, the terms of the act, though not strictly appropriate, are yet sufficiently expressive of the will of the (451) makers, that as to this property confiscation shall not operate.
Its avowed object is to quiet the minds of those persons to whom conveyances had been made, or were to be made of any part of the lands transferred to Cossart in trust for the U. F. To this end, the purview explicitly declares that the power of attorney from Cossart to Marshall shall be as good and valid in law as it could or might have been had the act of confiscation never been passed. The manifest design of the power of attorney was to enable Marshall to perform those acts for the benefit of the society, which Cossart, being absent beyond sea, could not, on that account, conveniently execute himself. If the act had merely admitted the power to probate, the questions of Cossart's right, and the consequent goodness of the sales, might have been still left open to future discussion. But it does not rest there; it gives validity to the power, and does therefore virtually and in effect confirm and validate the sales which had been made, or which might thereafter take place under it, so far at least as they required protection against the confiscation acts.
Thus far it seems necessary to proceed, for the sake of giving to the act a construction which is absolutely necessary to effectuate the intention of the Legislature, and one without which it is deprived of all sensible effect or useful energy; a construction, too, which is warranted by the maxim, "Quando lex aliquid concedit, concedere videtur et id perquod devenitur ad illud." A person whose title has been divested out of him by confiscation cannot sell, neither can he authorize another to sell for him; yet if an Act of Assembly gives validity to a power of attorney made by him, the sale taking place under it is necessarily confirmed. Nor can it be doubted that the same consequence will follow, if an Act of Assembly restore validity to a power of attorney made by a person having good title at the time, though it becomes defective by subsequent causes. The latter is supposed to have been the situation of Cossart when the act was passed. *Page 373 
The only defect of title in Cossart that seems to have been contemplated by the drawer of the act is the one arising from (452) confiscation; all others, from whatever cause, are omitted. It is probable that his title was not believed to be exposed to any other objections, and if it had been, that they also would have been provided against. I infer this from the apparent futility of passing an act for the purpose of redeeming a title from defects of one kind, when it is equally vulnerable in other parts. Forfeiture by reason of alienage and escheat are neither brought into view, nor is their possible operation guarded against; and I think that the Court cannot, upon just principles of construction, extend the act so as to remove the defects which may arise from these sources. Were the words used in the act obscure or doubtful, then the intention of the Legislature must have been resorted to in order to find the meaning; but here is no obscurity; the words are plain, their signification is obvious. Had expressions of general and comprehensive import been made use of, then the other supposed defects might have been considered within the equity of the act; but as they have specified confiscation alone, it cannot be safely asserted that they meant to comprehend the other cases of forfeiture and escheat. A construction of this kind would seem to infringe the rule that private statutes ought to be construed strictly. 2 Mod., 57. Whereas, the construction that wrests the sales from the imperfection case on them by the confiscation laws is the genuine and necessary interpretation of the letter. It is also recommended by its perfect conformity to the principles of an enlarged and liberal justice. In this case, as in many others that appear in the private acts, the Legislature subscribed to the propriety of relinquishing claims under the confiscation acts, which, if vigorously insisted on, might have deprived one man of his property, for the absence or delinquency of another. They have accordingly, in several instances, abstained from appropriating to the public use lands whereon persons having a right in conscience were disposed to settle; and in virtue of their ownership, to render to the State the fidelity of good citizens. The law in question seems to offer a merited tribute of justice to a society of men, who in the midst of many difficulties established the workshops of industry, and diffused the habits of (453) moral order where, but a short time before, the silence of uncultivated nature reigned through the forest.
I will conclude this part of the case by remarking that the Legislature had an undoubted right to renounce claims which the public, whom they represent, might derive under the various acts of confiscation. The rights of third persons, though not expressly saved, are understood in all such cases to be guarded by equity. 8 Co., 138. Such rights, *Page 374 
however, do not appear in any of these proceedings, and therefore the act is not impeachable on that ground. The unavoidable consequence is, that the title of these lands was either in Montgomery's trustees or in the State; if the latter acquired it by confiscation, then the Act of Assembly amounts to an abandonment of such right.
2d. Before the year 1776, it cannot be doubted that Christian F. Cossart, being, together with the inhabitants of this State, common subjects of the same sovereign, was capable of taking by descent lands situate in the then province, and of holding them. Before that period also the descent was case, and Cossart was, in the full legal sense of the term, tenant in fee simple, and as such liable to execute the trusts, with which the title was incumbered. But the argument is, that by the severance of these States from the British Empire, he became an alien, and thenceforward incapable of holding any real estate within this territory; and that the consequence of his alienage was a forfeiture of his lands to the State.
The cases upon this subject to be found in the books do not furnish a ground of strict analogy, nor even sufficient data wherefrom direct inferences can be drawn applicable to the new and peculiar modifications proceeding from our revolution. By the term alien, the writers mean a person born out of the King's allegiance. No instance is to be found where lands once lawfully acquired have become forfeited on the ground of posterior alienage; the possibility of such a case seems to be (454) excluded by the doctrine in Calvin's case, Co. Rep., and a fundamental maxim of the common law, "nemo potest exuere patriam." Some of their late writers have, however, considered the inhabitants of the United States as aliens, from the recognition of their independence; and it is possible they might be considered in the same light by the law of that country, in all the consequences of that character. Whether they have subjected lands owned in that country by the citizens of this, to the principle of alienage, I am not informed. I am inclined to believe they have not, in any instance; because the late treaty with that nation recognizes in one of its articles the holding of lands in that country by the citizens of this, and so vice versa.
It may, however, be thought that some of the reasons upon which the common law found the incapacity of an alien to hold lands, apply, with undiminished strength, to attach alien disability to those who became aliens by the revolution. In both cases it would be equally impolitic to permit the permanent property in the soil to be held by those who owe no constant allegiance to the government, lest the influence thus generated might be directed against the policy and welfare of the country. But if the opinion be correct (which is advanced by a writer of *Page 375 
reputation, 2 Bl., though denied in Parker, 144), that the forfeiture which ensues the purchase by an alien, is intended by way of punishment for his presumption in attempting to acquire any landed property; such a reason totally fails in its application to cases circumstanced like the present. For punishment cannot with justice be inflicted where neither crime has been committed nor presumption manifested.
In the acquisition of his title, Cossart was passive — it was cast upon him by the operation of law, which would have continued to extend its silent protection to it, but for an event which was beyond the reach of individual agency. Had he even been an inhabitant of the State before the commencement of the revolution, and dissatisfied with the prospect of the new political arrangement about to open, writers on the law of nations say that a person so situated may dispose of his (455) effects and remove wheresoever he pleases. This principle is likewise recognized in the confiscation laws of this State. If the doctrine rested upon this ground alone; if aliens were to be deprived of property purchased by them, only by way of punishment for having attempted to become proprietors, then it is clear that such a consequence ought not to be extended to persons who take property before the separation of the United States from Great Britain. But with whatever reasons of policy or justice confiscation may have been extended to those who abandoned their country in the hour of danger, and neglected to avail themselves of the privilege of selling; or to those who, after having pledged their allegiance to the new government, united their hostile exertions with the enemy, no blame can, with propriety, be imputed to the persons who thought proper to remain in their own country. If forfeiture of the lands of such persons, arising from their incapacity to hold, be the consequence of the revolution, it must then be rested upon the single ground of public policy, from which I do not apprehend that any principle arises which warrants the application of more rigorous or summary justice to divest their titles, than might have been called forth had they purchased, being aliens. I cannot discern any reason why the law of forfeiture on account of alienage, if it is applied to these persons, should not be accompanied with the same restrictions, which belong to it in the case of an alien purchasing before or since the revolution. The one may purchase but cannot hold; the other was at the time competent both to purchase and hold, but his capacity for the latter is supposed to be destroyed by supervenient causes. An alien, according to the common law definition, does by purchase acquire the freehold, and become tenant to the lord of whom the lands are holden. And until office found, he is recognized as a tenant for many purposes; therefore survivorship shall take place between an *Page 376 
alien and a subject who purchase in joint tenancy, which continues until it is severed by the office; because the freehold being in the alien by livery, shall only be divested by the solemnity of an office. (456) Dyer, 283. On a covenant to stand seized, an use will arise for an alien. Godb., 275. An alien tenant in tail may suffer a recovery and dock the remainders. Goldbor., 102. Although common recoveries are deemed to some intent fictitious, yet the writ of entry must be brought against one that is actually seized of the freehold by right or by wrong. Pigot, 28. Therefore, unless an alien was considered as seized of the freehold, he could not be a good tenant to the praecipe. It is also generally true, that wherever an alien takes by his own act, the freehold is considered as in him, until an office, although he is not permitted to take by an act of law even for the benefit of the king.
From these authorities and this reasoning, I think these conclusions are deducible: That in the application of the law of forfeiture to Christian F. Cossart, he ought to be considered in the light of an alien purchasing lands in this province or State, either before or since the revolution — that in the one case the lands would not have been divested out of him, and vested in the lords proprietors; nor in the other in the State, without an office. That this solemnity not having been performed, no title of forfeiture has accrued to the State.
3d. Escheat for want of a legal proprietor. The general acceptation of the term escheat, according to the common law, supposes that the person last seized has died without heirs, or that his blood is attained. In the one case the writ of escheat must show the death of the tenant. 10 Viner, 155. In the other, there must be judgment of death given in some court of record against the felon found guilty, by verdict or confession of the felony; or it must be by outlawry of him. Bac., Use of the Law, 38. It denotes an obstruction of the course of descent, and a consequent determination of the tenure, by some unforeseen contingency, in which case the land naturally results back by a kind of reversion to the original grantor or lord of the soil. 2 Bl., 244. According to another writer, it imports something happening or returning to the lord on a determination of the tenure only. Wright on Ten., 117. The word originally signifies anything coming accidentally or by (457) chance, and in such sense comprehending casual obventions and forfeitures of all kinds. In the general and comprehensive sense of lands left without any lawful proprietor, from whatever cause, it is probable that the Legislature used the term, when, in 1789, they vested all escheats in the University. But the questions whether the lands of Christian F. Cossart were comprised under this general denomination, *Page 377 
whether they were left without any lawful proprietor, and devolved upon the State as an escheat, I conceive it unnecessary for me to give an opinion upon, because there are other grounds upon which I can decide this case, in a manner satisfactory to my own mind; and without necessity I should feel reluctant in giving an opinion upon a point, respecting which the greatest lawyers have disagreed, and which may probably be the only question in some future case. Its importance entitles it to a separate and solemn argument and deliberate investigation; and it might be unsafe to decide it, but under all the light which these may reflect upon it.
4th. It is contended that the State has taken this land discharged of the trust, in analogy to the prerogative of the King, who is incapable of being a trustee; and to the lord by escheat, who, coming in by title paramount, and in the post, takes the land free from any collateral charges, wherewith the tenant had incumbered it. To maintain these positions, and the consequences drawn from them, a great variety of authorities has been introduced; but I cannot, after a careful perusal, collect from them that the law is so settled at this day. Assuredly the doctrine is not reconcilable with the broad and liberal principles adopted by this Court, in the consideration of trust estates; nor with the reason and policy of making the statute of uses.
As trusts are said to be the mere creatures of a Court of Equity, into which they were drawn on account of some scruples which the common law judges could not surmount, a system has been steadily persevered in with respect to them, most likely to effectuate their intent; and at the same time to avoid those inconveniences which had rendered uses odious. It could not, therefore, be just to suffer them to fail, (458) and the right intentions of the parties to be undermined, by reason of any disability in the trustee. In this Court he is properly considered as the mere instrument of conveyance, and can extinguish the right of cestui que trust only in a single instance, that of conveying to a purchaser without notice of the trust, and for a valuable consideration. In conformity with this equitable notion, the decisions have been extended to a great and beneficial length. Where a trustee has been incapable through some legal disability to convey or execute an estate, the court of chancery has removed him out of the trust. 2 Chan. Ca., 130.
Wherever there is a defective or improper trustee, chancery acts as if there were none. 1 Brown Cha. Ca., 81. And in every instance the Court is solicitous to carry into effect the intention of the person who is really the owner of the land, and to attach the trust to the land itself, rather than make it dependent on the personal competency of the trustee. *Page 378 
The source of all complaints against uses, as they prevailed previous to the Statute of H. VIII, was, that the feoffees were considered as the true owners; and the mischiefs which flowed from them, under the influence of this opinion, would result in an equal degree from trusts, were the estate of the trustee held in greater estimation than that of the cestui quetrust. That statute divested the possession out of the person seized to the use, and transferred it to the cestui que use, with a view of annulling those inconveniences which were occasioned by considering the feoffee as the real owner; which character subjected him to the performance of the feudal duties, gave dower to his wife, placed his infant heir in wardship to the lord, and forfeited the estate upon his attainder.
The principle upon which the doctrine in Chudleigh's case is founded is, that persons coming in by a paramount and extraneous title, are not seized to an use, as the disseizor, abator or intruder of the feoffee, or the tenant in dower, or by the courtesy of a feoffee, or the lord (459) entering upon the possession by escheat; none of these claiming under the feoffee, but being, as the law expresses it, in the post. When that case was decided, trusts had not undergone much discussion; their principles were but partially developed; and the foundation only of that system laid, by which they have been since made to answer the beneficial ends of uses, without their inconveniences. In justice and reason, the title of persons so claiming was no better than that of the heir or alienee. Every volunteer claimant, and every claimant with notice, whether they come in the per or the post, ought to be bound to the performance of the trust. And in relation to this point, the sentiments of Lord Mansfield are applicable: "I apprehend the old law of uses does not conclude trusts now; where the practice is founded on the same reasons and grounds, the practice is now followed. Its positive authority does not bind where the reason is defective; more especially that part of the old law of uses which did not allow any relief to be given for or against estates in the post, does not now bind by its authority in the case of trusts." 1 Bl., 1155.
The decisions, so far as the point has been decided, justify these sentiments. If a trustee commits felony, though the land are forfeited at law, yet cestui que trust may have relief in equity; so if he commits treasons. 3 Com., 386. The trustee of a legacy dying before the legacy is paid, shall not prejudice the legatee; so if a trustee of land dies, without heir, though the lord by escheat will have the land at law, yet it will be subject to the trust in equity. Prec., ch. 202.
If A puts out money at interest in the name of B, who afterwards becomesfelo de se, A may be relieved against the King, upon the Statute 33 Hen. VIII. 1 Eq. Ca. Abr., 384. The general principle which *Page 379 
prevails in a Court of Equity is to consider the trustee as having the legal ownership so far only as to be beneficial to cestui que trust, and not subject to any advantage or disadvantage which may arise from the trustee personally, as having the legal estate. These authorities derive countenance and support from Gilbert on Eq., 172; 1 Brown Cha. Ca., 204.
Nothing can be fairly collected from the case of Burgess v. (460)Wheat, 1 Bl., 123, or from Fonblanque's note to Gilbert's Treatise, to impeach the soundness of the doctrine. In the former it was only decided against the opinion of Lord Mansfield, that the crown could not in equity, upon a failure of the heirs of cestui que trust, claim against a trustee by escheat, if he had the legal estate in him, upon the principle that the title by escheat could only arise where there was a defect of a tenant; but that the ground of escheat failed, whenever there was a tenant, whether he were beneficially interested or not. The Court did not decide, nor did the case present the question, whether a lord by escheat was discharged of the trust, as against the cestui que trust; but the opinion of the majority of the Court was, that if an estate, liable to a trust, come to the King, the land will, in equity, be equally bound by the trust in the hands of the King, as of a common person.
If, then, the persons beneficially interested in this case, possessed a right against the State, notwithstanding the escheat from the trustee, the cause between the present parties ought to be decided without prejudice from the consideration that the plaintiffs can have no remedy from the State. For whether such a remedy against the State existed or not, which could only properly be tried where the State was a party, I should think that this Court might furnish them with an adequate remedy against persons claiming under the State with notice of the trust, which is the character given by the bill to these defendants. The doctrine of prerogative, if introduced here to govern questions relative to the rights of the State, should not be extended further than just analogy and a temperate application of its principles will warrant. It should be made subservient to the purposes of justice, while it protects the immunities of the State; and such of its consequences as promote these objects, should be adopted with the doctrine itself. Now, though a suit will not lie against the King, yet his prerogatives are not transferred with the property to his grantee. Thus his patentee shall not take advantage of the maxim, nullum tempus occurrit regi. Poph., 26. If the King grant lands which he has seized without title or matter of record, (461) the person having right may enter upon the grantee without petition. Skin., 608. If the King enters without title, or seizes land by a void or insufficient office, he is no disseizor; but if by letters patent *Page 380 
he grants the lands so seized, and the patentee enters, he is a disseizor; because he has time to inquire into the legality of his title, which the King is supposed to want leisure for. 5 Bac., 607. "In all cases where the party grieved may have a monstrans de droit, or travers against the King, there if the King granteth over the land, the party grieved may enter, or have his action against the patentee." 4 Rep., 212. Viewing these authorities as creating a difference between the crown and its grantee, and so authorizing a full legal remedy against the latter, where only the partial remedy of a petition or plea of right was allowed against the former; and considering that there are cases where our Legislature has sanctioned bills in equity for injunctions against the State, I am led to the conclusion that the present defendants are not privileged from answering by reason of deriving their title from the State.
The objections to the form of the present bill have been rested upon the following grounds of argument: That all persons materially interested in a suit in equity ought to be made parties plaintiff or defendant, however numerous they may be, so that a decree complete and final may be made. That the persons who advanced money for the purchase of these lands being entitled to satisfaction, either in lands if they came to this country, or out of the money arising out of the sale of the lands if they did not come, ought to have been parties to the bill, and that the members who compose the U. F. ought to have been named in the bill, and their interest stated. That the creditors who advanced money, together with the sums respectively loaned by them, should likewise have been stated, in order that the Court might see the nature and extent of their interest. And it is particularly insisted upon, that although the bill is brought by Marshall, in behalf of himself and the concerns of the U. F., yet it would be unjust to decree for all the members, since (462) they alone are beneficially entitled, by whose assistance the lands were purchased.
To ascertain the due weight of these objections, it will be necessary to inquire who the parties concerned in interest really are, and what are the ends and purposes of the bill.
The U. F. is an association of persons voluntarily submitting to certain regulations, with a view of promoting objects of a religious and social nature. They have neither incorporation, joint stock, nor funds; but they prosecute, under the influence of a sentiment common to the whole community, certain ends which they deem necessary to the prosperity of their society. If, in their native country, they possessed not the assurance that the toils of their industry would meet an adequate reward, or that free toleration would be allowed to the exercises of their religion, it was natural to seek a more favored clime, where new *Page 381 
settlements for the accommodation of their members might be formed, under happier auspices. With this view the lands purchased from Lord Granville were obtained, by means of loans procured from their able members, by the lord advocate, chancellor and agent, and active members. The security for the money advanced consisted in their agent's responsibility to convey lands to them if they came over to this country, or to sell lands and reimburse them out of the proceeds, if they did not. So long as the title of the lands purchased by their agent remained in him, the creditors had an option, either to compel him to convey to them in satisfaction of their respective debts, or to sell, and by that means satisfy them. But when he, clothed with full powers for that purpose, made sale of the lands, the rights of the creditors were necessarily abridged to a simple claim of the money which they had advanced. In the specific lands, which form the subject of the present controversy, it is apparent that the creditors, whoever they are, can have no interest. All they can ask or obtain is the money due on the sale, and this they can only receive in the event of its appearing that Graff's sale to Montgomery conveyed a good title. If, on the other hand, Graff had no right to sell, the steps by which that conclusion is arrived at, (463) lead also to this other, that the complainant has no right to the land. The bill accordingly seeks a decree that the defendants may convey the legal title, if they have any, to the trustee of Montgomery, or that they may deliver possession of the land to the trustee, for the use and benefit of the infants; and that the executor of Montgomery may pay the complainant in trust for the U. F. the principal and interest due upon the purchase. Should the claims of the complainant be established by a decree, his character will be that of a trustee for so much money as is recovered for those creditors who made advances for the Wachovia purchase. It is then to be examined, whether the principles of equity require, or the authorities cited prove, that all the persons who lent money ought to have been parties to the bill.
It is expedient for several reasons, that all persons concerned in a demand should be called before the Court.
If it appears upon the face of the bill that there are other parties whose rights may be affected by a decree, it would be vain and useless to go on to a decision of the cause: For a decree made under such circumstances is liable to reversal, or at least none but the real parties, and those claiming under them, are affected by it, and the persons who are left out may vex the defendants with another suit. Wherever any of these inconveniences may follow, from the omission of parties, the general rule ought to be observed, and all the parties interested, however numerous they may be, should be brought in. *Page 382 
Unless this case, under all its circumstances, comes within some of the exceptions to the rule, the demurrer on this ground must prevail. It will be proper, in order to ascertain this question, to examine in the first place the cases cited, by which the rule itself is illustrated. The case of Leigh v. Thomas, 2 Vesey, 312, the substance of which is, that a bill was brought for an account of prize-money, and to have two shares paid to two plaintiffs, as agents, which they claimed under the general articles on which the cruise was set on foot. In them there was no appropriation of shares to persons afterwards appointed agents, (464) but a general provision that the crew should have liberty to appoint two agents. The plaintiffs were appointed agents by a subsequent deed, signed by sixty-four out of eighty, the number of the whole crew; and they brought this bill in behalf of themselves and of the said sixty-four. Upon a demurrer for not making the whole crew parties, the master of the rolls was of opinion that the whole crew ought to have been made parties, because the subsequent agreement could not be binding on them; and that they had a right to litigate the claim set up by the plaintiffs of two shares on their own account. This decision is clearly justified by the reasons on which the rule is founded. No decree made in the case could have been binding on the absent part of the crew, who had given no authority for the suit, and whose rights were improperly attempted to be drawn into controversy without their consent.
The case of Kirk v. Clark and others, Finch's Prec., 275, was where a bill was brought by a trustee to compel the specific performance of marriage articles, and the cestui que trust was not made a party; and therefore it was prayed that the cause might not go on, after opening the bill and answer, because if the bill should be dismissed, the cestui quetrust would not at all be bound by it; and so the defendants liable to another suit for the same cause — and the cestui que trust was directed to be made a party. It was observed in that case, that bills had been sometimes allowed which were brought by a cestui que trust, without making the trustee a party; yet that was upon the cestui que trust's
undertaking for the trustee that he should conform to what decree should be made, which might be reasonable, he having no interest at all in his own right; but a trustee could not so undertake for his cestui que trust.
The principle and policy of the rule are again manifest in this case: The rights of the person substantially interested shall not be litigated without making him a party, nor shall the suit be tried in the absence of a party nominally concerned, if by possibility he may renew the contest. The cestui que trust may undertake that the trustee (465) shall conform to the decree, because the former is really the true *Page 383 
party; but a trustee cannot so bind the cestui que trust. If the cestui quetrust, instituting a suit in his own name, may proceed to a decree upon his undertaking that the trustee shall conform to it, by the same reason may the latter prosecute a suit where the cestui que trust undertakes for himself. It can be of no importance by whom the suit is brought, if the party not before the Court is bound, either by himself, if the cestui quetrust, or by the cestui que trust, if the trustee, not to disturb the decree which shall be made. This reasoning is of force in the present case, when connected with the statement in the bill, that the complainant is authorized to institute suits in law or equity concerning the matters complained of, and that the U. F. are bound and concluded by all such judgments and decrees as may be rendered, etc.
The case in Bunbury, 53, and that of Hanne v. Stevens, 1 Vernon, 110, do further establish the general doctrine, and the reasoning in the latter case demonstrates its propriety, that a defendant, as a trustee for three persons, is not bound to answer a bill brought by one of the cestuis quetrustent; for otherwise he might be thrice called to an account for the same matter.
But the circumstances of the complainant being authorized to bring suit for the others concerned in interest, and of the present suit being brought to recover the money for which the land sold, seem to bring the present case completely within the principle of those wherein it has been held that creditors seeking an account of real and personal estate for payment of their demands, a few suing on behalf of the rest, may substantiate the suit. The following case is very applicable, both in authority and the reasons on which it is founded: Finch, 592, Chancey v.May. This was a bill brought by the present treasurer and manager of the Temple Mills Brass Work, in behalf of themselves and all other proprietors and partners in the first undertaking, except the defendants, who were the late treasurer and managers, being about thirteen in number, and was to call them to an account for several misapplications, mismanagements and embezzlements of the copartnership, in the late South Sea times, to a great amount. The copartnership (466) consisted originally but of eighteen shares, but those eighteen shares, in the year 1720, were split and divided into five hundred. The defendant demurred for that all the rest of the proprietors were not made parties, and so everyone had the same right to call them to an account, and then they might be harassed and perplexed with multiplicity of suits. But the demurrer was disallowed: 1st. Because it was in behalf of themselves and of all others, the proprietors of the said undertaking, except the defendants, and so all the rest were in effect parties.2d. Because it would be impracticable to make them all parties *Page 384 
by name, and there would be continual abatements by death and otherwise, and no coming at justice if all were to be made parties.
With equal propriety it may be said in the present case, that the suit being brought by Marshall, in behalf of himself and the concerns of the U. F., all the persons who have an interest in the money advanced are virtually and in effect parties, and if continual abatements would not be the necessary effect of inserting the whole, at least endless delays might be expected as the natural consequence.
It is needless to multiply authorities upon this part of the case, for in every view of it presented to my mind, the suit is properly instituted by Marshall in behalf of himself and the others concerned. From this mode I cannot foresee that any inconvenience will arise, any deterioration of the rights of others, or any needless and unjust vexation to the defendants; for a decree, in the present form of the bill, will forever preclude the persons who are interested, by having advanced the money to effect the purchases, from suing the party defendants, on the grounds made by the present bill.
If, by the judgment of the Court, the demurrer should be overruled, and the defendants required to answer — if the complainant's power to prosecute suits for the U. F. and his capacity to bind them by a judgment should then be doubted, the Court before whom the cause is tried may, and no doubt will, require such proofs of his asserted (467) authority as will clothe their decree with conclusive effect.
Upon the whole of this case, the general conclusions of my opinion are, 1st. That the private act passed in 1782, did effectually and completely clear Cossart's title to the lands which he held as trustee for the U. F., from all defects and imperfections, to which any of the confiscation acts passed by the Legislature of this State might, before that time, have subjected it.
2d. That the State gained no title by forfeiture on account of alienage, for want of an office, or something equivalent; even if the principles of the common law warrant the extension of this doctrine to persons who lawfully held lands in this State prior to the revolution, and who have not since become citizens of this State, or any of the United States — a proposition which I am not at present prepared to admit, in the extent insisted on.
3d. Waiving any positive opinion upon the question whether the lands escheated to the State, under the comprehensive notion of the term, which casts upon the sovereignty of the country all titles to lands which would otherwise be destitute of a lawful proprietor, I am decidedly of opinion that even such a legal title would be subject to the *Page 385 
equitable right of the cestui que trust, and is, in the hands of persons claiming under the State, subject to the equitable remedy of the cestui quetrust.
4th. That the manner in which the complainant's bill is framed with respect to parties, is warranted by reason and sanctioned by authority, consequently that the demurrer ought to be disallowed.
Cited: Benzein v. Lenoir, 16 N.C. 225.
NOTE. — On the first point, see Vann v. Hargett, 22 N.C. 31. And on the last point, see Van Norden v. Primm, 3 N.C. 149; Belloat v. Morse,ibid., 157.
(468)